**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

BELINDA MOSTELLER,        :

      **Plaintiff**      :

    **v.**               **CIVIL ACTION NO. 1:CV-06-0973**

                   :

MICHAEL J. ASTRUE[1],          **(CONNER, D.J.)**
**Commissioner of**      :        **(MANNION, M.J.)**
**Social Security**

                   :

      **Defendant**

                   :

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("S.S.I."), under Title XVI of the Social Security Act, ("Act").  42 U.S.C. §§401-433, 1381-1383f.

## I. PROCEDURAL HISTORY.

The plaintiff protectively filed an application for S.S.I. on October 28, 2003, alleging disability since May 16, 2003.  (TR. 76)[2].  The state agency

---

[1]Michael J. Astrue became the Commissioner of Social Security effective February 12, 2007.  Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. §405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

[2]The court notes that this is the plaintiff's fourth application for S.S.I. The plaintiff filed previous applications on December 18, 2000, January 13, 1999, and September 23, 1991.  The plaintiff's 2000 claim was denied
(continued...)

denied her claim initially, (TR. 62-67), and the plaintiff filed a timely request for a hearing, (TR. 68).  A hearing was held before an Administrative Law Judge, ("A.L.J."), on December 21, 2005.  (TR. 33-60).  In addition to the plaintiff's testimony, the A.L.J. heard the testimony of Ronald Sholtis, a vocational expert.  The plaintiff was denied benefits pursuant to the A.L.J.'s decision of February 6, 2006.  (TR. 10-21).  The plaintiff requested review of the A.L.J.'s decision, (TR. 9), which the Appeals Council denied on March 24, 2006, thereby making the A.L.J.'s decision the final decision of the Commissioner.  (TR. 5-8).

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Doc. Nos. 8 & 9).


## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).  Substantial evidence "does not mean a large or considerable

---

[2](...continued)
through the hearing level by decision dated August 14, 2001, and was not pursued any further.  The plaintiff's 1999 and 1991 claims were denied at the initial level on March 19, 1999, and March 4, 1992, respectively, and were not pursued any further.  (TR. 13).

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

3

## III. ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. *See* 20 C.F.R. §416.920. *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. 20 C.F.R. §416.920.

The first step of the process requires the plaintiff to establish that she has not engaged in "substantial gainful activity." 20 C.F.R. §416.920(b). The second step involves an evaluation of whether the plaintiff has a severe impairment. *See* 20 C.F.R. §416.920(c). The Commissioner must then determine whether the plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. §416.920(d). If it is determined that the plaintiff's impairments do not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the plaintiff has established that she is unable to perform her past relevant work. 20 C.F.R. §§416.920(e)-(f). The plaintiff bears the burden of demonstrating an inability to return to her past relevant work. *Plummer*, 186 F.3d at 428. Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the plaintiff is able to perform, consistent with her medically determinable impairments, functional limitations, age, education and work experience. 20 C.F.R.

4

§§416.920(g), 416.960(c).  At this final step, the Commissioner is to consider the plaintiff's stated vocational factors.  *Id.*

Here, the A.L.J. proceeded through each step of the sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act.  (TR. 13-21).  At step one, the A.L.J. found that the plaintiff had not engaged in substantial gainful work activity since her alleged onset date of May 16, 2003.  (TR. 15).  The A.L.J. went on to conclude at step two that the plaintiff's impairments, including degenerative disc disease in her lumbar spine and cervical spine, status post arthroscopy with subacromial decompression, and depression were severe within the meaning of the Regulations.  (TR. 15-16).  At step three, the A.L.J. found that the plaintiff's impairments were not severe enough to meet or equal, either singly or in combination, the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4.  Specifically, the A.L.J. considered Listing Sections 1.02, 1.04, 11.14, and 12.04.  (TR. 16).  At step four, the A.L.J. found that the plaintiff was not able to perform her past relevant work as a housekeeper.  (TR. 16-19).  Finally, at step five, the A.L.J. determined that the plaintiff had the residual functional capacity, ("R.F.C."), to perform a limited range of light work, and that a significant number of jobs exist in the local and national economies which the plaintiff could perform.  (TR. 20-21).  Thus, the A.L.J. concluded that the plaintiff was not disabled within the meaning of the Act.  (TR. 21).  20 C.F.R. §416.920(f).

## IV.  BACKGROUND.

The plaintiff, forty-six (46) years old at the time of the A.L.J.'s decision, was considered a younger individual under the Regulations. 20 C.F.R. §416.963.  The plaintiff has an eleventh grade education.  (TR. 37-38).  Her work history includes employment as a housekeeper.  (TR. 102).

At her hearing before the A.L.J., the plaintiff testified that she is unable to work because of pain in her back, neck and shoulder.  The plaintiff testified that she aches all over, and that lifting her legs causes pain in her lower back. The plaintiff testified that she cannot lift her right arm over her head, but that she does not have any problems with her left upper extremity.  With respect to additional functional limitations, the plaintiff stated that she can only sit for thirty minutes, stand for ten to fifteen minutes and walk a few feet.  She testified that she also has problems with depression and anxiety, and although her medications help her with mood swings, she still gets depressed and cries a lot.  Due to stress, the plaintiff testified that she suffers anxiety attacks.  (TR. 18-19, 37-54).

The medical evidence, as summarized by the A.L.J. and the parties, establishes that the plaintiff suffered a work-related injury on May 7, 1997, at which time she was shoveling, lifting and dumping potting soil when she developed pain in her upper back and neck.  (TR. 16, 258).  The plaintiff was diagnosed with myofascial right upper back pain and treated conservatively with medication and physical therapy.  (TR. 16, 261-66).

6

In 1998, the plaintiff was involved in a motor vehicle accident, after which she complained of severe pain in the back of her neck, upper chest, right upper extremity, and lower back.  (TR. 17).

M.R.I. testing of the plaintiff's lumbar spine showed only mild annular bulging of the L4-5 disc; however, M.R.I. testing of her cervical spine showed central disc herniation at the C6-7 level and annular bulging at the C5-6 level which was causing an asymmetric impression on the ventral aspect of the thecal sac.  (TR. 267-96).  As a result, on January 25, 2001, the plaintiff underwent a right C6-7 laminectomy, foraminotomy, and external neurolysis. (TR. 17, 148-49).

On March 16, 2001, Hani J. Tuffaha, M.D., the plaintiff's treating physician, noted mild painful derangement in the neck in all directions with myofascial tenderness over the right trapezius.  The plaintiff's mechanical and neurological examinations were noted to be satisfactory.  As such, the plaintiff was released back to light duty work.  (TR. 150-52).

M.R.I. testing of the plaintiff's right shoulder performed on January 15, 2002, was unremarkable.  (TR. 153-55).  In addition, E.M.G. studies carried out on February 19, 2002, were within normal limits.  (TR. 267-96).

Around the time of the plaintiff's current alleged onset date of disability, on May 16, 2003, she reported "working a lot" cleaning hotel rooms at that time.  (TR. 219).

On July 13, 2003, the plaintiff presented to the emergency room

complaining of pain from her neck to her lower lumbar area as a result of carrying linens all day.  The plaintiff was prescribed medication and released. (TR. 176-77).  On the following day, the plaintiff called the emergency room stating that she was not able to get to the pharmacy the prior day before it closed.  As a result, she indicated that she was unable to work due to pain. The attending physician wrote a one-day excuse from work for the plaintiff. (TR. 179).

On August 1, 2003, Dr. Tuffaha noted no evidence of spinal or neural foraminal stenosis and no herniations.  Degenerative changes involving C5-6 and C6-7 were noted with small central disc protrusions.  No significant changes were noted in comparison to a study conducted on January 14, 2002.  (TR. 287).

On August 1, 2003, the plaintiff told her primary care physician that she lost her job when she requested lighter duty work.  (TR. 215).

On August 4, 2003, the plaintiff requested that her physician give her an "excuse" not to testify at a hearing, but her doctor advised her to work around her pain medication.  (Id).

Two months later, the plaintiff filed the instant application for S.S.I.

At a visit to the emergency room on November 20, 2003, the plaintiff complained of pain under her tongue which she had pierced a week earlier. The plaintiff was prescribed medication and released.  (TR. 157-62).

Over the next several months, the plaintiff telephoned her primary care

8

office on several occasions for forms to be completed for her S.S.I. claim. (TR. 205-12, 439). The plaintiff indicated that "[e]very job I get I gotta give up due to so much pain," and complained that she could not get benefits for "temporary" disability. However, Dr. Thomas would only complete the plaintiff's form for temporary disability for a period less than twelve months. (TR. 211, 439-40).

On February 25, 2004, Dr. Thomas' office advised the plaintiff to seek employment "in areas that don't require heavy lifting or bending." (TR. 207).

The plaintiff subsequently requested to see Abigail Buhain, M.D., another doctor at the health center. (TR. 205). Dr. Buhain noted no functional deficits or abnormalities upon examination and indicated that the plaintiff "wants disability." (TR. 184). Instead, Dr. Buhain referred the plaintiff to physical therapy. (TR. 182-83).

On April 15, 2004, the plaintiff was evaluated by a state agency physician. (TR. 187). Upon examination, Rajidi Reddy, M.D., noted that the plaintiff had some tenderness of the lower C-spine and upper thoracic spine on percussion. Tenderness of the lower and upper lumbar vertebral was also noted. Paravertebral muscles appeared to be spastic. Limitation of movement of the C-spine and trunk was noted with a positive straight leg raising test at 70 degrees. There was some tenderness of the medial anterior aspect of the right shoulder with a mild decreased range of movement. Handgrip was somewhat decreased bilaterally by 15%. Range of movement of the elbows,

wrists, hips, knees and ankles were well preserved. The plaintiff's gait was normal and it was noted that she did not use any assistive devices. (TR. 189). Based upon the plaintiff's evaluation, Dr. Reddy opined that the plaintiff had the functional capacity for no more than light work activity. (TR. 193-94).

On May 26, 2004, the plaintiff requested that her records be transferred from her primary care office to a new office. The plaintiff was angry that the appointment she missed could not be rescheduled sooner. (TR. 204-05).

On August 5, 2004, the plaintiff returned to Dr. Buhain. At that time, she was referred to physical therapy, but refused, indicating that she wanted her disability papers signed. Dr. Buhain noted that the plaintiff's examination was "benign except for limited extension in lumbar spine." Flexeril was added to the plaintiff's regimen and she was referred for pain management. (TR. 331-35).

On August 31, 2004, the plaintiff sought care from Rene R. Rigal, M.D., a pain management specialist. Upon examination, Dr. Rigal noted that the plaintiff had a full range of motion of the neck to the end of the range of motion on hyperextension, posterior glide, lateral rotation, and lateral tilt. Negative Spurling sign was noted bilaterally. There was no pain on axial loading. No paraspinal tenderness or tenderness in the muscle groups in the posterior scapular region. The plaintiff was noted to have shoulder impingement in the right shoulder. Deep tendon reflexes were preserved bilaterally and symmetrical. No motor or sensory deficits of the upper extremity were noted.

10

There was negative Tinel of the elbow and wrist.  Negative Phalen's sign and negative Hoffmann's sign were noted.  The plaintiff was noted to have good bilateral grips.  Dr. Rigal opined that she was "at a loss of what to offer," since there were no targets that would be amenable to injection therapy.  (TR. 375-77).

On September 1, 2004, the plaintiff returned to the primary care office from which she transferred earlier and requested to reestablish care for her midback and neck pain.  (TR. 417).  The plaintiff's examination revealed no tenderness, good range of motion, and intact neurological functioning.  (Id.).  Her diagnostic studies revealed minimal findings.  (TR. 288-90).

On November 3, 2004, the plaintiff reported that she started a new job cleaning and that she felt she twisted her back when she moved a bed.  (TR. 412).

On November 7, 2004, the plaintiff presented to the emergency room complaining that working exacerbated her pain.  A notation indicates that the plaintiff was not in the waiting room when called for examination.  (TR. 325-27).

On March 12, 2005, the plaintiff underwent another M.R.I. of her upper right extremity.  The radiologist read the study as showing a focal tear involving the shoulder tendon posteriorly.  (TR. 296).  Relatedly, on March 16, 2005, Dr. Miller indicated that the plaintiff was taking Tylenol 3 with "good results."  (TR. 396).

11

On March 28, 2005, the plaintiff presented to Dr. Feldmann, an orthopedic surgeon.  Dr. Feldmann noted that the plaintiff had only some "mild" impingement findings, and despite the M.R.I. report, a full thickness tear was "not identified" upon his review of the study, nor upon his request for a second review.  (TR. 419-20, 433).

In May 2005, the plaintiff returned to Dr. Miller requesting to switch specialists because she did not like Dr. Feldmann.  (TR. 389-91).

On May 4, 2005, the plaintiff "self-referred" for a psychological evaluation for depression.  (TR. 454).  The plaintiff stated that she had pain and work issues, and was suicidal because her boyfriend threatened to leave her.  (TR. 454-57).  The plaintiff was prescribed Elavil but complained that it made her tired; she switched to Lexapro but complained it was not helping. (TR. 382, 389).  Although her mood was observed as "good" and she was laughing, the plaintiff complained that she was not sleeping due to pain and problems with her boyfriend.  (TR. 381, 450-51).

Upon switching specialists for her complaints of shoulder pain, the plaintiff presented to G. Dean Harter, M.D., a neurosurgeon.  (TR. 421).  Dr. Harter found no evidence of shoulder instability and opined that it was difficult to tell if there was even a positive impingement sign.  (TR. 422).  After reviewing the plaintiff's diagnostic studies, Dr. Harter also opined, "I cannot really ascertain the exact nature of her problem . . . There are many social issues at work here . . . I certainly would not consider myself to operate on her

12

shoulder." (Id.).

On July 21, 2005, a study of the plaintiff's cervical spine revealed "perhaps" some mild straightening of the spine suggesting some muscle spasm, but otherwise was unremarkable.  Dr. Andreychik, an orthopedic specialist, found no clinical evidence of radiculopathy or myelopathy concerning the plaintiff's cervical area and referred the plaintiff back to Dr. Feldmann for follow-up of the shoulder symptoms.  (TR. 423, 434).

On August 3, 2005, Dr. Feldmann informed the plaintiff that although she was not the ideal candidate for surgery, he scheduled an arthroscopy of her right shoulder as a second opinion suggested that she may gain some improvement of her vague symptoms.  (TR. 425).  Notably, the arthroscopic findings confirmed Dr. Feldmann's earlier opinion that the plaintiff's shoulder joint was normal and had no cuff tear.  (TR. 428-29). The plaintiff was given a work excuse for five weeks so that she could begin therapy.  (TR. 432). Although Dr. Feldmann signed the plaintiff's medical assistance form indicating "temporary" disability for right shoulder impingement, he specified that the plaintiff had no limitation with sitting, standing, or walking.  (TR. 418, 443).

The record is void of post-operative reports of any treatment or therapy followup for the plaintiff's back/neck/shoulder pain.

On November 15, 2005, the plaintiff treated for depression.  At that time, she was assessed a Global Assessment of Functioning, ("G.A.F."), score of

51[3].  (TR. 446).

On January 16, 2006, it was indicated that the plaintiff would be temporarily disabled, for a period of less than twelve months, due to depression.  (TR. 459-60).

## V.  DISCUSSION.

Initially, the court notes that the plaintiff has filed a motion to remand the instant action to the Commissioner based on new evidence unavailable at the time of her hearing before the A.L.J.  (Doc. No. 10).  The evidence which the plaintiff wishes to have considered relates to a cervical operation, a fusion at

---

[3]A GAF score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders DSM-IV at 30 (4th ed. 2000).  The GAF score is taken from the GAF scale which is "to be rated with respect only to psychological, social and occupational functioning."  Id.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 32.

A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders, Text Revision, 34 (4th ed. 2000) ("DSM-IV").

Although a low GAF score does not necessarily require a finding of disability, See Seymore v. Apfel, 131 F.3d 152 (10th Cir. 1997)(Table), the same principles that govern consideration of evidence in general govern consideration of GAF scores, Emarthle v. Apfel, 166 F.3d 347 (10th Cir. 1998)(Table).

C5-C7, which was performed on January 29, 2007, almost one year after the A.L.J.'s decision in the plaintiff's case.

The standard for a remand for new trial is based upon 42 U.S.C. §405(g), which provides in pertinent part:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  In Szubak v. Sec'y of Health and Human Services, 745 F.2d 831 (3d Cir. 1984), the Third Circuit elaborated on this standard.  The Court stated that the evidence "must first be 'new' and not merely cumulative of what is already in the record."  745 F.2d at 833.  It must also be material, meaning that it is "relevant and probative" and there is a "reasonable possibility that the new evidence would have changed the outcome of the [Commissioner's] determination."  Id.  "An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."  Id.

The Court of Appeals for the Third Circuit also addressed the issue of new evidence in a disability case in Matthews v. Apfel, 239 F.3d 589 (3rd Cir. 2001).  There, the court held that when new evidence is presented to the Appeals Council, that was not before the A.L.J., the district court could remand the matter to the A.L.J. only if the evidence is new and material and

there was good cause shown for the evidence not to have been presented to the A.L.J. Id. at 594. Similarly, when evidence is presented for the first time to the district court, there must be good cause shown for the new and material evidence not to have been presented to the A.L.J. Id. at 592. The Matthews court made clear that remand for consideration of new evidence is not a light matter. The court warned that "[i]f we would order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the A.L.J. in order to preserve a reason for remand." Id. at 595.

Upon review of the documentation submitted by the plaintiff in conjunction with her request for remand, as well as the record which was before the Commissioner on the plaintiff' current application, the court finds that, while the evidence submitted by the plaintiff is "new," in that it did not exist at the time the plaintiff's current application was pending, it is not "material." To this extent, based upon the objective medical evidence, the plaintiff's condition which required her to undergo cervical fusion surgery on January 29, 2007, did not exist at the time that the plaintiff's current application was pending before the Commissioner. In fact, it appears that the plaintiff suffered a deterioration of her previously non-disabling condition. Therefore, the plaintiff's motion for remand based upon this evidence should be denied.

With respect to the instant appeal, the plaintiff's central argument is that the A.L.J. erred in failing to properly address her subjective complaints.

16

With respect to subjective complaints, the regulations require objective clinical signs and laboratory findings which demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. §416.929(b).  If the medical evidence establishes the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, the regulations then require the A.L.J. to evaluate their intensity and persistence and their effect on the claimant's capacity to work in light of the entire record. 20 C.F.R. §§416.929(c)(1)-(3).  The Third Circuit has indicated that "[t]his obviously requires the administrative law judge to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  *Hartranft v. Apfel*, 181, F.3d 358, 362 (3d Cir. 1999).  Where the A.L.J.'s credibility findings are supported by substantial evidence, those findings will not be disturbed on appeal.  *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

In this case, the A.L.J. found that the plaintiff's subjective complaints of total disability were not entirely credible in light of the evidence of record as a whole.  The A.L.J.'s finding is supported by substantial evidence.  To this extent, the A.L.J. reviewed the objective medical records and laboratory findings, and found that they did not support the plaintiff's claims of total disability.  In fact, in light of the lack of objective medical findings, the plaintiff's own physicians opined on various occasions that the plaintiff would be

17

capable of performing work activity at the medium or light exertional level. (TR. 151, 179, 205, 207, 334, 439).   Moreover, the A.L.J. noted the lack of evidence in the record that the plaintiff exhibited any sign of chronic pain, which although not conclusory by itself, is a factor contributing to the determination of the credible degree of pain.   (TR. 19). The A.L.J. also considered the plaintiff's testimony presented at her hearing.   Giving the plaintiff the benefit of the doubt, the A.L.J. restricted the plaintiff to performing work at the light exertional level with a sit/stand option and several postural limitations.   (TR. 16, 19).   Based upon the A.L.J.'s determination of the plaintiff's residual functional capacity, a vocational expert testified that there would be a significant number of jobs in the local and national economies which the plaintiff could perform.

Based upon the record as a whole, the A.L.J. gave adequate consideration to the plaintiff's subjective complaints, and her finding that the plaintiff's subjective complaints were not entirely credible is supported by substantial evidence.   Therefore, the plaintiff's appeal should be denied.

## VI.   RECOMMENDATION.

Based on the foregoing, it is recommended that:

(1)   the plaintiff's motion to supplement records and remand the instant action based on new evidence, **(Doc. No. 10)**, be **DENIED**; and

**(2)**     the plaintiff's appeal of the decision of the Commissioner of

Social Security, **(Doc. No. 1)**, be **DENIED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:** August 30, 2007

O:\shared\REPORTS\2006 Reports\06-0973.01.hhs.wpd